**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------X
BRANCH BANKING & TRUST CO., : CV-02-4331 (ERK)
:
                Plaintiff, : **MEMORANDUM & ORDER**
:
    - against - :
:
INTERAMERICAN MORTGAGE CORP., :
:
                Defendant. :
-------------------------------------------------------X

KORMAN, C.J.:

      This matter is before me on the parties' cross-motions for summary judgment. The plaintiff, Branch Banking and Trust Company ("BB&T") brought this diversity action against InterAmerican Mortgage Corp. ("IMC"), seeking to recover the balance due on six loans in which BB&T claims a ninety percent ownership interest. In response, IMC argues that BB&T has no ownership interest in the loans and that IMC is the sole owner. Indeed, IMC not only denies that it is delinquent in making payments to BB&T, but has filed counterclaims seeking the refund of all remittances made to BB&T, as IMC claims the payments were made in error. Because the record evidence uniformly supports BB&T's position, and because IMC has failed to come forward with any evidence sufficient to raise a genuine issue of material fact, BB&T's motion for summary judgment is granted.

I.

      The background facts in this case are complex, as the loans at the center of this dispute ("the loans") have a complicated history because of a number of bank take-overs and mergers involving the relevant financial institutions. The loans are these:

| **Borrower** | **Date of Origination** | **Original Principal Amount** |
|:---:|:---:|:---:|
| Corbett | May 22, 1985 | $85,000.00 |
| Lake | July 12, 1985 | $74,000.00 |
| Phillips | July 18, 1985 | $152,100.00 |
| DeLuca | July 26, 1985 | $55,000.00 |
| Griffin | November 13, 1985 | $35,000.00 |
| Glover | November 15, 1985 | $45,000.00 |

BB&T's Rule 56.1 Statement ¶ 1; IMC's Rule 56.1 Statement ¶ 1.

The loans were originated by First Federal Savings & Loan Association of Raleigh, North Carolina ("First Fed Raleigh"). First Fed Raleigh serviced the loans from the time they were originated until March 6, 1992, when Resolution Trust Company ("RTC") took over First Fed Raleigh and acquired the loans. Subsequently, RTC assigned the loans to Olympic Home Mortgage Corporation ("Olympic"). The Assignment of Deed of Trust/Mortgage documents ("Assignments"), dated November 15, 1993, state that RTC, acting as receiver for First Fed Raleigh "absolutely granted, sold, assigned, transferred, and set over" to Olympic "all of [RTC's] right, title and interest" in the loans, "except as expressly set forth in that certain Loan Participation Interest Sale Agreement" between Olympic and RTC. The Assignments also indicate that, prior to the assignment from RTC to Olympic, "a participation interest ha[d] been sold." See Assignments (Pl. Ex. H). In March 1997, Olympic changed its name to InterAmerican Mortgage Corporation ("IMC").

According to the plaintiff, at some point after the loans were originated, First Fed Raleigh sold a 90% participation interest in the loans to First Federal Savings & Loan Association of High Point, North Carolina ("First Fed High Point"). However, neither party has been able to produce a Participation Agreement recording the transfer of the 90% interest in the loans; the plaintiff claims

2

that the Participation Agreement once existed and has simply been lost, while the defendant claims such a document does not exist, because First Fed High Point never acquired an interest in the loans to begin with. In 1991, BB&T merged with First Fed High Point, and the plaintiff maintains that as a result, BB&T acquired First Fed High Point's 90% interest in the loans.

It is undisputed that neither IMC nor BB&T has produced a Participation Agreement recording the sale of 90% of the loans to First Fed High Point, or for that matter to BB&T. However, BB&T has presented evidence establishing that, beginning as early as 1992, BB&T regularly received remittances on the loans from IMC and its predecessors in interest. Indeed, BB&T received remittances from First Fed Raleigh, from RTC, and finally from IMC; all these payments were calculated according to the assumption that BB&T had a 90% participation interest in the loans. BB&T maintains that these payments were made in recognition of the 90% interest which BB&T actually owned in the loans; IMC responds that these payments – regularly made over nearly a decade – were simply made in error.

In September 2000, IMC ceased making remittances on the loans to BB&T. When asked why the payments had stopped, the IMC employee responsible for processing the remittances, Kimberly Novotny, initially explained that she simply "fell behind" in her duties. However, Novotny then requested that BB&T forward IMC a copy of the Participation Agreement on the loans. Because BB&T was unable to furnish such a document, IMC refused to continue making remittances on the loans, and claimed that the past payments must have been in error. After IMC ceased making any payments to BB&T, BB&T sued for breach of contract, unjust enrichment, money had and received, conversion, and for the imposition of a constructive trust.

While IMC denies that BB&T ever owned any interest in the loans, BB&T has submitted

3

substantial evidence indicating that, at the very least, for several years IMC and its predecessors operated under the belief that BB&T was the majority owner of the loans. A May 1992 remittance report indicated that First Fed Raleigh calculated a remittance to BB&T in accordance with the belief that BB&T had a 90% ownership interest. (Pl. Ex. P) In a letter dated September 3, 1992 RTC informed BB&T that it was taking over the servicing of loans from First Fed Raleigh, and that BB&T would be receiving its remittance payments from a new servicing agent. (Pl. Ex. Q) Subsequently, in a letter dated November 21, 1993, the servicing agent notified BB&T that RTC had sold its interest in the loans to Olympic, and instructed BB&T to direct future inquiries to Olympic. (Pl. Ex. R) A spreadsheet from Olympic shows that a January 31, 1994 remittance payment to BB&T was calculated based on the assumption that BB&T had a 90% ownership interest in the loans. (Pl. Ex. S) All of these documents indicate that IMC's predecessors in interest and RTC's servicing agent all operated with the understanding that BB&T had a 90% ownership stake in the loans.

Additional evidence submitted by BB&T further buttresses its position. A draft Foreclosure Recommendation for the Phillips loan, prepared by RTC's servicing agent, stated that the loan was "a participation loan owned 10% by the RTC as receiver for First Federal Savings Association of Raleigh. The remaining 90% is owned by Branch Banking and Trust Company." (Pl. Ex. K) In addition, BB&T was asked to pay – and indeed, did pay – 90% of the expenses associated with the foreclosure of another loan within the same portfolio as the loans. (Pl. Ex. L). Indeed, IMC acknowledges that BB&T paid 90% of the foreclosure expenses, and that IMC accepted those payments. See IMC's Rule 56.1 Statement ¶¶ 10-11. Of course, most significant is the fact that over a period of nearly ten years, IMC and its predecessors in interest intentionally made remittances to BB&T that were calculated at a rate of 90%, less a servicing fee retained by IMC.

BB&T has received no remittances on the loans since September 20, 2000, and maintains that it is now due $372,211.17. BB&T suggests that "IMC's 'defense' to this action – that over the course of almost a decade, it and its predecessors 'mistakenly' paid BB&T 90% of the revenue collected in connection with the subject loans, keeping only 10% of the revenue for themselves – is incredible, defying all notions of business and common sense." Pl. Memo. of Law in Support of Motion for Summary Judgment at 2.

In response, IMC argues that because BB&T has been unable to produce any Participation Agreement, it has not established any ownership interest in the loans. Accordingly, IMC has counterclaimed against BB&T for the return of all the remittances IMC contends were made in error.[1] In support of its position that it is the sole owner of the loans, IMC relies on the Assignments. IMC avers that the Assignments transferred 100% ownership of the loans from RTC to Olympic, and that the language in the Assignments stating that each was subject to "certain Loan Participation Interest Sale Agreement" was simply standard boilerplate language that lacked significance if a Participation Agreement was not attached to the Assignment. Predictably, IMC maintains that no Participation Agreement was ever attached.

Of course, BB&T contends that the language in the Assignments is significant, and is secondary evidence indicating that, in fact, the Participation Agreement did exist at one time but has simply been lost. BB&T maintains that, although RTC did assign 100% of its share of the loans to Olympic, RTC could only transfer what it actually owned – which was only a 10% interest in the loans. Indeed, the Assignments do not quantify RTC's participation interest in the loans, but just

---

[1] In addition, IMC seeks the return of remittances it paid BB&T on an additional 23 loans. In total, IMC seeks the return of remittances paid on 29 loans. IMC maintains that it paid BB&T remittances on all of these loans in error, and seeks the return of $1,412,454.46.

5

indicate that RTC assigns all of its interest in the loans to Olympic. Moreover, the Assignments all provide that prior to the assignment from RTC to Olympic, "a participation interest ha[d] been sold in each loan." See Assignments (Pl. Ex. H).

II.

Both parties have moved for summary judgment, which is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Minor or inconsequential factual disputes do not render summary judgment inappropriate; rather, a disputed issue of fact must be "material." See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). To be "material" a fact question must relate to a matter which "might affect the outcome of the suit." Id. To defeat summary judgment, the disputed fact issue must be such that a "reasonable jury could return a verdict for the nonmoving party." Id.

The initial burden is on the moving party to demonstrate that there are no material facts in dispute, after which the burden shifts to the nonmoving party to go beyond the pleadings and identify specific facts that present a triable, disputed issue. See Celotex Corp. V. Catrett, 477 U.S. 317, 233-23 (1986). In this case, if BB&T were to establish entitlement to summary judgment on its claims, it could defeat IMC's counterclaims by demonstrating that no evidence exists that would allow IMC to carry its burden on its counterclaims. See U-Neek, Inc. v. Wal-Mart Stores, Inc., 147 F. Supp. 2d 158, 177-78 (S.D.N.Y. 2001); Diamond Direct, LLC v. Star Diamond Group, Inc., 116 F. Supp. 2d 525, 531 (S.D.N.Y. 2000).

The central issue in this matter involves the parties' dispute over the existence of the

6

Participation Agreement through which BB&T – through its predecessor in interest – allegedly acquired a 90% participation interest in the loans. While the Best Evidence Rule generally requires the production of an original document such as the Participation Agreement, see Fed. R. Evid.1002, Rule 1004 of the Federal Rules of Evidence provides that "[t]he original is not required, and other evidence of the contents of a writing . . . is admissible if [among other circumstances,] [a]ll originals are lost or destroyed, unless the proponent lost or destroyed them in bad faith." Fed. R. Evid. 1004(1). Here, there is no evidence suggesting that BB&T lost or destroyed the Participation Agreement in bad faith.

In order to rely on secondary evidence to prove the contents of the Participation Agreement, BB&T must first demonstrate that "it has made a 'diligent but unsuccessful search and inquiry for the missing [Participation Agreement]." Burt Rigid Box, Inc. v. Travelers Property Casualty Corp., 302 F.3d 83, 91 (2d Cir. 2002) (citations omitted). Generally, the "'diligence' requirement is not a matter to be determined by the fact finder. Rather, under Rule 104(1) of the Federal Rules of Evidence, '[p]reliminary questions concerning . . . the admissibility of evidence shall be determined by the court.'" Id. at 92.

Here, BB&T contends that it has made a thorough and diligent search for the missing Participation Agreement. Specifically, BB&T states that Glenn Walker, Vice President and Operations Manager for BB&T, took numerous actions to search for the Participation Agreement. As detailed in Mr. Walker's affidavit, he searched for the document in the place it was most likely to be, the BB&T Investor Accounting file for IMC. The search was unsuccessful. Walker also reviewed the inventory list for the Investor Accounting records in BB&T's central records facility. Mr. Walker searched the most promising box of files from this location, but did not find the

Participation Agreement. On May 22, 2002, Walker discussed the matter with BB&T Assistant Vice President Tish Burdick, who was also unable to locate the document. He also spoke with the manager of the central records facility, who informed him that, because of a ten-year document retention policy, there was little chance of recovering the Participation Agreement. Next, Walker spoke with BB&T's Mortgage Merger Manager, but this employee did not have any records relating to BB&T's merger with First Fed High Point. Walker spoke with at least two former employees of First Fed High Point, neither of whom could produce the Participation Agreement. In addition, Walker unsuccessfully sought to contact a retired BB&T employee who was involved in administering loans serviced by other institutions.

Finally, Walker sought to procure the Participation Agreement by contacting other institutions which might have a copy of the Participation Agreement. He unsuccessfully sought to contact employees of RTC, which had acquired First Fed Raleigh, the company which initially originated the loans. Through counsel, Walker contacted the Federal Deposit Insurance Company ("FDIC"), which maintains RTC's records. Even after a subpoena was issued to the FDIC, however, it did not produce any copy of the Participation Agreement. Robert Davidson, FDIC's counsel, notified Walker that he had unsuccessfully searched for the document. And Walker contacted Ray Ashman and Robert Light, employees of Cenlar, which served as a subservicer of the loans for IMC in 1996. The two Cenlar employees stated that, even if they had received the Participation Agreement in the past, they would have returned it to IMC after their subservicing contract ended. Like all of Walker's other attempts to find a copy of the Participation Agreement, these efforts were unsuccessful.

I find that BB&T conducted a diligent – albeit unsuccessful – search for the Participation

Agreement, and therefore, that BB&T may attempt to prove the contents of the Participation Agreement by using secondary evidence. See, e.g., Burt Rigid Box, 302 F.3d at 91; Colonial Tanning Corp. v. Home Indemnity Co., 780 F. Supp. 906, 922 (N.D.N.Y. 1991); Brown v. Bowen, 668 F. Supp. 146, 150 (E.D.N.Y. 1987); Burroughs Wellcome Co. v. Commercial Union Ins. Co., 632 F. Supp. 1213, 1222-23 (S.D.N.Y. 1986). I have already detailed the numerous pieces of evidence that support BB&T's contention that it has a 90% ownership interest in the loans. They include, most significantly, the nearly ten-year course of conduct of IMC and its predecessors, as well as various computer reports and letters generated by IMC's predecessors in interest or their servicing agents, all of which reflect a belief that BB&T owned 90% of the loans.

While IMC attempts to rely on the Assignments to demonstrate its 100% ownership of the loans, the Assignments state that the loans are conveyed subject to a "Loan Participation Interest Sale Agreement," and note that "a participation agreement ha[d] been sold" in each loan. See Assignments (Pl. Ex. H). Moreover, IMC has produced no other evidence to contradict the substantial secondary evidence submitted by BB&T. Nevertheless, IMC maintains that it is entitled to have a negative inference drawn that the Participation Agreement never existed, because it was not discovered even after a diligent search was made. See Def. Reply Memo. of Law in Further Support of Def. Cross-Motion for Summary Judgment at 5-7 (citing Fed. R. Evid. 803(7)). In the face of the substantial evidence BB&T has offered in support of its position that it owns a 90% interest in the loans, IMC's argument is simply insufficient to raise a triable issue of fact.

In short, given BB&T's undisputed secondary evidence, IMC's position that it consistently paid 90% of the payments it received to BB&T in error simply strains credibility. IMC has failed to come forward with any evidence sufficient to raise a genuine issue of material fact as to the

9

ownership of the loans, and therefore, summary judgment in favor of BB&T is appropriate. See Burt Rigid Box Inc. v. Travelers Property Casualty Corp., 126 F. Supp. 2d 596, 621 (W.D.N.Y. 2001) ("Aetna, by failing to submit anything contradicting the secondary evidence, has failed to demonstrate the existence of a material issue of fact requiring submission to the jury so as to avoid summary judgment in favor of Burt."), rev'd in part on other grounds, 302 F.3d 83, 86 (2d Cir. 2002) ("We hold that . . . [plaintiff] is entitled to summary judgment on the existence and terms of the policies in this case because it has adduced sufficient unopposed evidence to meet that standard . . .").

For similar reasons, IMC's motion for summary judgment on its counterclaims must fail. IMC has failed to offer any evidence to support its contention that it is the sole owner of all the loans in question. IMC again relies on the Assignments executed in its favor by RTC, but, as previously explained, these documents do not quantify the ownership interest which RTC granted to IMC. Because the Assignments alone do not raise an issue of fact as to the ownership of the loans, and because IMC has not provided any other evidence from which a reasonable jury could find in its favor, IMC's motion for summary judgment on its counterclaims must be denied.

III.

For the foregoing reasons, BB&T's motion for summary judgment is granted, and IMC's cross-motion for summary judgment is denied.

SO ORDERED.

Dated: Brooklyn, New York
December 17, 2004

s/Edward R. Korman
Edward R. Korman
United States District Judge

10